**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

DENISE TRUCKENMILLER,

       Plaintiff,

vs.

BURGESS HEALTH CENTER and
FRANCIS TRAMP,

       Defendants.

No. C 10-4066-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

---

**TABLE OF CONTENTS**

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
    A.  *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
        *1.*   *The parties and their relationship* . . . . . . . . . . . . . . . . . . .  3
        *2.*   *Truckenmiller's job performance* . . . . . . . . . . . . . . . . . .  5
        *3.*   *Truckenmiller's complaints about unequal treatment* . . . . . . .  8
        *4.*   *The aftermath* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
    B.  *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
        *1.*   *Truckenmiller's Complaint* . . . . . . . . . . . . . . . . . . . . . .  10
        *2.*   *The defendants' motion for summary judgment* . . . . . . . . .  11

II.  LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
    A.  *Standards For Summary Judgment* . . . . . . . . . . . . . . . . . . . . . .  13
    B.  *Truckenmiller's EPA Retaliation Claim* . . . . . . . . . . . . . . . . . . .  18
        *1.*   *The EPA and the FLSA* . . . . . . . . . . . . . . . . . . . . . . . .  18
        *2.*   *Truckenmiller's prima facie case* . . . . . . . . . . . . . . . . . .  21
            *a.*   *Arguments of the parties* . . . . . . . . . . . . . . . . . . . .  21
            *b.*   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23
               *i.*   *Sufficiency of the "complaint"* . . . . . . . . . . . .  23
               *ii.*   *Causal connection* . . . . . . . . . . . . . . . . . . .  25
        *3.*   *The defendants' legitimate reason and pretext* . . . . . . . . . .  28

        *a.*     *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . 28
        *b.*     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    *4.*     *Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
  *C.*  *The Wrongful Discharge Claim* . . . . . . . . . . . . . . . . . . . . . . 33

*III.*  *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Was the plaintiff human resources director terminated for poor performance or for voicing concerns about differences in titles and pay between male and female members of the senior leadership team at the defendant hospital? While that question animates this lawsuit alleging retaliation in violation of the Equal Pay Act (EPA) provisions of the Fair Labor Standards Act (FLSA), 26 U.S.C. § 215(a)(3), the motion for summary judgment by the defendants, the hospital and its chief executive officer, first raises the question of whether the plaintiff made a "complaint" of sufficient formality, seriousness, clarity, and detail to put the defendants on notice that the plaintiff was asserting rights protected by the statute, or just an informal comment at the end of a meeting as everyone was packing up. In other words, the question is whether the plaintiff engaged in any protected activity at all. The plaintiff points out that she had made a similar comment two months earlier, but when she dared raise the matter a second time, making clear that she believed the hospital's policy violated the law and needed to be addressed, she was terminated within two days for reasons that are pretextual. The motion for summary judgment requires me to consider, among other issues, the import of the

Supreme Court's recent decision in *Kasten v. Saint-Gobain Performance Plastics Corp.*, ___ U.S. ___, 131 S. Ct. 1325 (2011), concerning the requirements for a "complaint" sufficient to invoke the anti-retaliation protections of the FLSA.

## I.  INTRODUCTION

### A.  Factual Background

I will not attempt here an exhaustive dissertation on the undisputed and disputed facts in this case.  Rather, I will set forth sufficient of the facts, both undisputed and disputed, to put in context the parties' arguments concerning the defendants' motion for summary judgment.  Unless expressly indicated otherwise, the parties agree that the facts stated are undisputed.[1]

### 1.  The parties and their relationship

Defendant Francis Tramp, the President/Chief Executive Officer of defendant Burgess Health Center (Burgess), hired plaintiff Denise Truckenmiller in August 2006 as the Director of Human Capital for Burgess.  Truckenmiller's employment was at-will. Truckenmiller chose to refer to her position as "Human Capital" rather than "Human Resources," because she felt that "human resources" was an old-fashioned term, but the parties dispute whether or not she could have called herself "Chief" rather than "Director," if she had wanted to, and whether a difference in titles would have made any difference to her pay.  The parties agree that Truckenmiller's position was important to

---

[1]I have not necessarily stated facts precisely as the parties have stated them in their respective statements of facts or responses to each other's statements of facts; instead, I have occasionally recast them to eliminate disputed language, to track more precisely the language of documents or deposition testimony, and for other editorial or organizational reasons.  Nevertheless, I believe that I have accurately indicated what facts are undisputed and which are disputed and why.

Burgess.  They also agree that conditions of Truckenmiller's employment were compliance with Burgess's policies and reaching the goals that Burgess had set for her.

Truckenmiller received Burgess's Human Resources Policy Handbook and Standards of Performance.  The latter stated, in pertinent part,

- Be sure you know and understand the responsibilities of your job.  Take charge of and accept these responsibilities.

- Perform your work in a timely manner. . . .

- Complete tasks. . . .

Defendants' Appendix at 77.  Burgess also had an equal opportunity anti-discrimination policy, with which Truckenmiller was familiar as the Director of Human Capital.  That policy's purpose was "[t]o insure [sic] that Burgess Health Center offers equal employment opportunity to all persons."  Defendants' Appendix at 107.

As Director of Human Capital, Truckenmiller was part of Burgess's senior leadership team, which included three other female members, Jean Pekarek, the Director of Patient Experiences, Patty Sandmann, the Senior Nursing Director, and Theresa Butler, the Director of Quality, and three male members, Tramp, the CEO, Shawn Gosch, the Chief Financial Officer, and Kim Norby, the Chief Information Officer.  Truckenmiller contends that she and other females with "Director" titles received $20,000 to $25,000 less per year than their male counterparts with "Chief" titles.  Truckenmiller also served on the committee working to obtain a Pathways to Excellence designation for Burgess from the American Nursing Credentialing Center, which is a program recognizing outstanding distinction in healthcare.  The parties agree that Burgess's Board of Directors had issued a directive to hospital management to achieve a Pathways designation as a high priority.

4

Truckenmiller contends that the Pathways to Excellence project is still on-going at Burgess today.

The parties agree that the wage review process, or Burgess's "salary matrix," was one of Truckenmiller's significant job duties and that she had lead responsibility for its completion. Preparing the "salary matrix" included going through Burgess's employees' job titles, ensuring that the titles matched the job duties, and making sure that each job and/or employee was in the appropriate pay grade using multipliers from the Iowa Hospital Association's survey. Burgess's Board of Directors required an update of the "salary matrix" annually for the overall hospital budget so that salaries and raises could be determined.

### 2.    *Truckenmiller's job performance*

The parties dispute whether Truckenmiller excelled at her job or suffered persistent performance problems. The parties agree that Truckenmiller was instrumental in changing the "culture" that existed at Burgess, resulting in improvements in the work environment. Truckenmiller asserts that she also received positive performance evaluations in 2007, 2008, and 2009, with few identified areas in need of improvement, and also received raises in 2007 and 2008. In contrast, the defendants focus on the identification of areas that needed improvement in each of those evaluations and Tramp's determination not to give Truckenmiller a raise in 2009, because she had missed project deadlines, which Truckenmiller admits doing. Truckenmiller also does not dispute that Tramp offered to hire a job coach for her, at Burgess's expense, to help her succeed in her position. In November of 2009, Tramp discussed with Truckenmiller his concerns about her failure to meet the Pathways to Excellence deadlines, but Truckenmiller contends that only minor deadlines had to be pushed back, and that by May of 2010, the Pathways to Excellence project was still on schedule and that Theresa Butler, who was leading the Pathways

project, answered "yes" when Truckenmiller asked if "everything is good" and if Butler was "comfortable with this."

The defendants contend that, in 2009 and 2010, Truckenmiller had monthly meetings with Tramp to help her succeed and that Tramp told Truckenmiller during those meetings what she needed to do to improve her performance and get caught up, including getting caught up on the Pathways to Excellence deadlines.   Truckenmiller asserts, however, that *all* senior members met with Tramp on a monthly basis to discuss work issues, and that her work performance was only occasionally an issue that Tramp brought up during her monthly meetings.

The focus of Truckenmiller's claims is what happened in the first half of 2010. Truckenmiller admits that, in a January 2010 one-on-one meeting, Tramp discussed with her that she had again missed Pathway deadlines.  Truckenmiller asserts that she blamed that problem on "not being used to working with groups," but that she said that she would get the work done soon.  The defendants contend that, in a February 2010 meeting after Tramp returned from an ice fishing trip, Tramp told Truckenmiller that he had not thought about the hospital at all during his trip, except for his concerns about Truckenmiller's lack of success.  Tramp then told Truckenmiller that he did not want a repeat of the problems in 2009 that led him to deny her a raise and that she needed to prepare a 90-day action plan.  Truckenmiller does not recall specifics of the February 2010 meeting, but contends that Tramp always asked her to prepare a 90-day action plan on a quarterly basis, and that Tramp's version of this meeting matches allegations later submitted by Tramp in opposition to Truckenmiller's eventual claim for unemployment benefits, apparently suggesting that his allegations are post-hoc justifications.

Truckenmiller admits that Tramp had another discussion with her about her lack of progress on the Pathways to Excellence and how it affected the whole hospital at some

time in February or March.  She also admits that, on March 26, 2010, Tramp scheduled a meeting with her, noting, among other things, "[s]ignificant number of [Pathways] deadlines missed," and ending with the following:

> I am not sure it make[s] sense for the whole Pathway group to be meeting every other week at this time.  The lack of meeting timeliness is not acceptable and having bi-weekly meetings where a senior leader is missing deadlines is probably not good for the organization.

Defendants' Appendix at 132.[2]

On April 30, 2010, Tramp sent Truckenmiller the following e-mail:

> I spent time going through the wage information.  The biggest thing I noticed is that the salary ranges (Word document) did not agree with the min and max on the matrix.  I do not believe the salary range form's min and maxs were updated.  Therefore, I create[d] the grades worksheet above.  I also added two columns to the matrix worksheet—a column for when to move to the next range and midpoint of the range.  I updated the pay grade worksheet with what I think is the appropriate grade for the employees.
>
> Please do the following:
> 1.     Verify that the positions are in the appropriate grades.
> 2.     Check the pay grades worksheets to make sure that [the] right grade is list[ed] for each position.
> 3.     Check the years of experience is right.  I notice some strange items [concerning particular employees' years of experience].  Need to check each person for years of experiences [sic].

---

[2]It appears that Tramp scheduled the meeting and transmitted his comments about it to Truckenmiller using an electronic scheduling system.

> 4.  Have Lori [Jensen] [Truckenmiller's assistant]
> double check each of these or her check and you
> double check.  This has to be essentially perfect.

Call if you have questions.

Defendants' Appendix at 137.  Truckenmiller sent an updated version of the salary matrix to Tramp on May 21, 2010.  Although the defendants contend that Tramp discovered that the matrix still contained errors when he reviewed it, Truckenmiller contends that she was never told that there were still errors in the May 2010 salary matrix.

### 3.   *Truckenmiller's complaints about unequal treatment*

The parties agree that, about two months prior to her termination, Truckenmiller made some comments about unequal treatment of male and female members of the senior leadership group during a meeting of that group.  They do not agree on precisely what the comments were.  According to the defendants, at this meeting, Truckenmiller mentioned that "put[ting] on [her] HR hat," it looked to her like the three men had "Chief" titles, while the four women had "Director" titles, and that she now admits that she offered that statement "sort of matter of factually," just to "put it out there."  The defendants assert that there was no mention at this meeting of unequal pay between the men and women in question.  Truckenmiller asserts that she did specifically raise at this meeting the unequal pay structure between the men with "Chief" titles and the women with "Director" titles.  She also asserts that she made the statement, because she felt that titles were important for women moving up the ladder and because she felt that the positions in question were all starting to look more similar as the management structure was changing.  The parties agree that Tramp responded that titles did not mean anything to him, although Truckenmiller contends that this response came after about 30 seconds of silence.

8

The parties also have slightly different versions of what occurred in the course of another senior leadership meeting on May 24, 2010, which is when Truckenmiller contends that she made the second of two protected complaints about unequal treatment. Truckenmiller contends that, at this meeting, in her role as Director of Human Capital, she specifically brought up and objected to the unequal pay structure between women and men and stated that it needed to be addressed by Tramp and Burgess. Specifically, she contends that she pointed out that the three men with "Chief" titles earned pay grades three to four levels above women with "Director" titles, or approximately $20,000 to $25,000 more per year, even though both performed the same or similar job functions. Tramp does recall Truckenmiller stating that all senior leaders should be in the same pay grade. However, the defendants contend that Truckenmiller's comments came at the very end of the meeting, as everyone was packing up to leave, and that all she said, besides suggesting that all senior leaders should be in the same pay grade, was that she was bringing up again that she believed that the leadership team needed to start looking at the pay scales for senior leadership and that the Chief and Director titles came with a $20,000 to $25,000 difference in pay. The parties agree that there was no reaction, either agreement or disagreement, from those present to Truckenmiller's comments.

Truckenmiller admits that, as late as 2008, Burgess had had a female Chief Operating Officer. She also admits that most companies with a head human resources person called that person "Director" rather than "Chief."

### 4.    *The aftermath*

The defendants contend, and Truckenmiller denies, that on May 25, 2010, while she was out of the office, Tramp learned from Lori Jensen that Truckenmiller had not asked Jensen to double-check the salary matrix as Tramp had instructed in his April 30, 2010, e-mail. Truckenmiller contends that she had, in fact, completed the 2010 salary matrix

9

according to Tramp's instructions.  After his conversation with Jensen, Tramp decided to terminate Truckenmiller.  The parties agree that Tramp informed Truckenmiller that he was terminating her on May 26, 2010, and that he gave Truckenmiller a severance letter, but they dispute precisely what Tramp said was the reason.  The defendants contend that Tramp informed Truckenmiller that her termination was due to "poor performance" and that the salary matrix project that she had just sent him still was not accurate. Truckenmiller asserts that the only reason Tramp gave her for her termination at the time was "poor performance," not any problems with the salary matrix.  Truckenmiller contends that Tramp did not specify the nature of the "poor performance." Truckenmiller did not assert in the course of this meeting that her termination was retaliatory.

Truckenmiller contends that she was terminated without first receiving either a written or oral warning or the option to resign rather than be terminated, as was typical for employees in Truckenmiller's position.  The defendants contend that Tramp believed that he had carried out the intent of Burgess's policies by providing the 2009 performance review, which the defendants assert amounted to a written warning that would put Truckenmiller on notice that she might be terminated, and that Tramp also gave Truckenmiller an oral warning after his return from his February 2010 ice-fishing trip. The defendants also contend that the severance package that Tramp offered Truckenmiller was an offer to resign rather than be fired.

## B.  Procedural Background

### 1.   Truckenmiller's Complaint

Truckenmiller filed her Complaint (docket no. 1) initiating this action on July 12, 2010, naming as defendants both Tramp and Burgess.  Truckenmiller's First Cause Of Action in her Complaint is a claim of Equal Pay Act (EPA) retaliation, pursuant to 26

U.S.C. § 215(a)(3), alleging that her comments at the May 24, 2010, senior leadership team meeting constituted protected activity as a complaint that the unequal pay structure between men and women should be addressed by Burgess and its senior management team. She alleges that "Burgess terminated [her] employment," just two days after she made these comments, and that the termination was retaliatory, malicious and/or in reckless indifference to her rights, and in willful violation of the EPA, so that she is entitled to unpaid wages, liquidated damages, punitive damages, attorneys fees, costs, and such other and further relief as the court may allow. This cause of action does not expressly identify Tramp as an actor or seek any relief against him. Truckenmiller's Second Cause Of Action is a claim of wrongful discharge in violation of Iowa public policy. It is premised on her contention that she engaged in activity protected by the public policy announced in IOWA CODE § 216.6, because that statute forbids an unequal pay structure based on sex, and she raised concerns about the unequal pay structure between men and women on the senior leadership team at Burgess. She alleges that she was terminated "by Burgess" in retaliation for engaging in that protected activity. Truckenmiller also alleges that Tramp was personally involved in the decision to terminate her employment, so that he is personally liable to her for unlawful termination in violation of public policy. She seeks lost wages and benefits, front pay, general damages for emotional distress, costs, and such other and further relief as the court may allow. Burgess and Tramp filed a joint Answer And Affirmative Defenses (docket no. 6) on September 11, 2010, denying Truckenmiller's claims. By Order (docket no. 8), filed November 15, 2010, this matter was set for trial during the two-week period beginning on November 14, 2011.

### 2.    *The defendants' motion for summary judgment*

On May 31, 2011, the defendants filed a joint Motion For Summary Judgment (docket no. 13), seeking summary judgment on both of Truckenmiller's claims. As to

Truckenmiller's EPA retaliation claim, the defendants assert that Truckenmiller did not engage in any statutorily protected activity within the Supreme Court's recent definition in *Kasten v. Saint-Gobain Performance Plastics Corp.*, ___ U.S. ___, 131 S. Ct. 1325 (2011); that Truckenmiller's termination was not causally connected to her comments during the May 24, 2011, meeting; that Burgess had a legitimate, non-retaliatory reason, poor performance, for terminating Truckenmiller; and that Truckenmiller cannot prove that Burgess's reasons were pretextual.   The defendants also assert that Truckenmiller's wrongful discharge claim is preempted by the Iowa Civil Rights Act, IOWA CODE CH. 216, so that this claim should be dismissed and that defendant Tramp should be dismissed from this action, because this is the only cause of action against him.   Truckenmiller filed her Brief In Resistance To Defendants' Motion For Summary Judgment (docket no. 16), with supporting materials, on July 12, 2011, asserting that genuine issues of material fact bar summary judgment on her EPA retaliation claim, but conceding that her state-law wrongful discharge claim is preempted by the Iowa Civil Rights Act, so that she does not resist dismissal of that claim.   The defendants filed a Reply Brief (docket no. 17), and supporting materials, on July 22, 2011.

Neither the defendants nor the plaintiff requested oral arguments on the defendants' Motion For Summary Judgment in the manner required by local rules.   Thus, I will decide the motion on the parties' written submissions.   I regret that the press of other matters, including a two-week stint as a visiting judge in the District of the Northern Mariana Islands, a one-week stint as a visiting judge in the District of Arizona, and a complicated preliminary injunction matter requiring my immediate attention upon my return from Arizona, prevented me from reaching this matter sooner.

## II.  LEGAL ANALYSIS

### A.  Standards For Summary Judgment

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 585 (2007) (internal quotation marks and citation omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Thus, "the substantive law will identify which facts are material."  *Anderson*, 477 U.S. at 248.  An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence").

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue," *Hartnagel,* 953 F.2d at 395 (citing *Celotex,* 477 U.S. at 323), and demonstrating that it is entitled to judgment according to law.  *See Celotex,* 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied.").  Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))).

As the Eighth Circuit Court of Appeals has explained,

> As the Eighth Circuit Court of Appeals has explained,
> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, ---U.S. ----, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) *quoting Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  The nonmovant "must do more than simply show that

> there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).   "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 129 S. Ct. at 2677, *quoting Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348.

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-43 (8th Cir. 2011) (*en banc*).

The Eighth Circuit Court of Appeals recognized in a number of panel decisions that summary judgment is "disfavored" or should be used "sparingly" in employment discrimination cases.   *See id.*, at 1043 (collecting such cases in an Appendix).   The rationales for this "employment discrimination exception" were that "discrimination cases often turn on inferences rather than on direct evidence. . . .," *E.E.O.C. v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001) (*en banc*) (citing *Crawford*, 37 F.3d at 1341; *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999)), and that "intent" is generally a central issue in employment discrimination cases.   *See, e.g., Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1071 (8th Cir. 1998) (citing *Gill v. Reorganized Sch. Dist. R-6, Festus, Mo.*, 32 F.3d 376, 378 (8th Cir. 1994)); *see Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2005) (noting summary judgment is disfavored in employment discrimination cases because they are "'inherently fact-based.'" (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 806 (8th Cir. 2003))).   I had assumed that this same caution in granting summary judgment would apply to employment retaliation cases. *See, e.g., Martinez v. Cole Sewell Corp.*, 233 F. Supp. 2d 1097, 1022 (N.D. Iowa 2002) ("A claim of retaliation under Title VII that is subject to the *McDonnell Douglas* burden-shifting analysis depends just as completely on the inferences to be drawn from the

evidence as a disparate treatment or hostile environment claim. Therefore, the court concludes that summary judgment on such a claim should be granted just as seldom and sparingly as it is on any other employment discrimination claim." (internal citations omitted)).

On the other hand, the Supreme Court recognized that, even in employment discrimination cases, "'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). In its *en banc* decision in *Torgerson*, the Eighth Circuit Court of Appeals expressly rejected the notion that summary judgment in employment discrimination cases is considered under a separate standard, citing *Reeves* and *Celotex*. Instead, the court held as follows:

> Because summary judgment is not disfavored and is designed for "every action," panel statements to the contrary are unauthorized and should not be followed. There is no "discrimination case exception" to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial.

*Torgerson*, 643 F.3d at 1043.

Therefore, I will consider the defendants' Motion For Summary Judgment in this employment retaliation case according to the same standards that I would apply in any other civil case.

However, I must first observe that stating the legal principles of summary judgment in employment discrimination cases is a simple task. Applying those principles to the paper record that forms the judicial crucible that decides which plaintiffs may proceed to trial and which get dismissed is far more daunting. Missing in the standard incantation of

summary judgment principles is the role of experience.  Justice Oliver Wendell Holmes wrote, "The life of the law has not been logic; it has been experience." OLIVER WENDELL HOLMES, THE COMMON LAW 1 (1881).  Thus, experience teaches that thoughtful deliberation of summary judgment in employment discrimination cases is grounded in the consideration of each case through a lens filtered by the following observations.

Employment discrimination and retaliation, except in the rarest cases, is difficult to prove.  It is perhaps more difficult to prove today—more than seventy years after the passage of the FLSA, and more than forty years after the passage of the EPA, which are at issue here—than during the earlier evolution of these and other federal anti-discrimination and anti-retaliation statutes.  Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor leave a well-developed trail demonstrating it.  *See, e.g., Riordan v. Kempiners*, 831 F.2d 690, 697-98 (7th Cir. 1987).  Indeed, the Fifth Circuit Court of Appeals recognized more than thirty-five years ago, that "[a]s patently discriminatory practices become outlawed, those employers bent on pursuing a general policy declared illegal by Congressional mandate will undoubtedly devise more sophisticated methods to perpetuate discrimination among employees." *Rogers v. EEOC*, 454 F.2d 234, 239 (5th Cir. 1971) (later relied on by the Supreme Court in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-67 (1986), as one of the principal authorities supporting recognition of a cause of action for hostile environment sexual harassment under Title VII).

This court's experience suggests the truth of that observation.  Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination and retaliation cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge.  This is especially true, because the very best

17

workers are seldom employment discrimination and retaliation plaintiffs due to sheer economics:  Because the economic costs to the employer for discrimination or retaliation are proportional to the caliber of the employee,  discrimination or retaliation against the best employees is the least cost effective.  *See, e.g., id.*  Rather, discrimination and retaliation plaintiffs tend to be those average or below-average workers—equally protected by federal statutes prohibiting employment discrimination and retaliation—for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination.  *See, e.g., id.*

Consequently, with both the legal standards for summary judgment and the teachings of experience in hand, the court turns to consideration of the parties' arguments for and against summary judgment.

## B.  *Truckenmiller's EPA Retaliation Claim*

As mentioned above, the defendants' challenge to Truckenmiller's EPA retaliation claim is multi-pronged.  I will consider each of those prongs, to the extent necessary, below.  First, however, because "the substantive law will identify which facts are material," *Anderson*, 477 U.S. at 248, I begin my analysis of this claim with an overview of the requirements for proof of a retaliation claim under the EPA.

### 1.   *The EPA and the FLSA*

The Equal Pay Act (EPA) is a substantive amendment to the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201-219.  *See EEOC v. Home of Economy, Inc.*, 712 F.2d 356, 357 (8th Cir. 1983).  More specifically, "[t]he Equal Pay Act of 1963, P.L. 88-38, 77 Stat. 56, was adopted as an amendment to § 6 of the Fair Labor Standards Act of 1938. It anticipated the broader anti-discrimination provisions that became Title VII of the Civil Rights Act of 1964, 42 U.S.C. §  2000e *et seq.*"  *Ridgway v. United Hospitals-Miller Div.*,

563 F.2d 923, 924 n.2 (8th Cir. 1977).   The substantive provisions of the EPA are codified at 29 U.S.C. § 206(d).   That statute provides, in the part pertinent here, as follows:

> **(d) Prohibition of sex discrimination**
> **(1)** No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex:  Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1).

Because "[t]he EPA is an amendment to the FLSA and is codified under the same chapter . . . retaliation for filing EPA complaints, like retaliation for filing overtime complaints, is analyzed under [29 U.S.C. §] 215(a)(3)." *Lambert v. Ackerley*, 180 F.3d 997, 1014 n.5 (9th Cir. 1999); *accord Hutchins v. International Bhd. of Teamsters*, 177 F.3d 1076, 1082 (8th Cir. 1999) ("Under the Equal Pay Act an employee may recover for an actual or constructive discharge only when it is in retaliation for the employee's filing of a complaint or participating in other proceedings under the Act." (citing 29 U.S.C. § 215(a)(3))).   The FLSA's anti-retaliation provision provides, in the part pertinent here, as follows:

> [I]t shall be unlawful for any person—
> * * *
> **(3)** to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.

29 U.S.C. § 215(a)(3).

As the Eighth Circuit Court of Appeals has explained, courts "apply the familiar *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) (*McDonnell Douglas*), burden-shifting framework to [a] retaliatory discharge claim" under § 215(a)(3). *Grey v. City of Oak Grove, Mo.*, 396 F.3d 1031, 1034 (8th Cir. 2011). "To establish a prima facie case of retaliation under the FLSA [and hence the EPA], [the plaintiff] would have to show [1] that she participated in statutorily protected activity, [2] that the [employer] took an adverse employment action against her, and [3] that there was a causal connection between [her] statutorily protected activity and the adverse employment action." *Ritchie v. St. Louis Jewish Light*, 630 F.3d 713, 717 (8th Cir. 2011) (citing *Grey*, 396 F.3d at 1034–35). If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the plaintiff's discharge, and if the employer does so, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason for the discharge is not the true reason, but a pretext for retaliation. *Grey*, 396 F.3d at 1035. The ultimate issue, however, is whether the employer intentionally retaliated against the employee. *See, e.g., Blakely v. Schlumberger Tech. Corp.*, 648 F.3d 921, ___ (8th Cir. 2011) (page numbers not yet available) (discussing the application of the *McDonnell Douglas* burden-shifting framework in the context of an FMLA retaliation claim).

### 2.    *Truckenmiller's* **prima facie** *case*

#### a.    *Arguments of the parties*

The defendants argue that Truckenmiller's *prima facie* case fails, because she cannot show that she engaged in statutorily protected activity.  Citing *Kasten v. Saint-Gobain Performance Plastics Corp.*, ___ U.S. ___, 131 S. Ct. 1325 (2011), they argue that neither Truckenmiller's comment a few months before her termination, which was only offered as an "observation" regarding titles, without reference to a pay differential, nor her comments at the end of the May 24, 2010, meeting, as everyone was packing up, was sufficient to give the required formal, fair, and serious notice of an assertion of a grievance and statutory violation.  They also dispute Truckenmiller's ability to show any causal connection between her comments and her termination, because the mere coincidence of timing between her second comment and her discharge is not enough, and Truckenmiller admits that she has nothing else.  They point out that it was only after the May 24, 2010, meeting that Tramp learned that Truckenmiller had not followed his instructions to revise, correct, and double-check the salary matrix, and that this intervening event defeats the purported causal connection between Truckenmiller's purportedly protected comments and her discharge.

Truckenmiller counters that she has satisfied the requirements of *Kasten* for an adequate complaint, because she made her second set of comments during the senior leadership meeting, in her capacity as Director of Human Capital, expressly objected to the unequal pay structure, and asserted that the unequal pay issue needed to be addressed by Tramp and Burgess.  She cites pre-*Kasten* cases holding that such oral complaints by women to their employers about unequal pay constituted assertions of rights under 29 U.S.C. § 215(a)(3).  She also asserts that, because she had made a prior, similar complaint, the defendants were on notice of her objection.  She also contends that her

statements were not merely off the cuff, but sufficiently serious that another female member of the leadership committee congratulated her afterwards for her nerve or "guts" in raising the issue.   Truckenmiller also argues that she has established the necessary causal connection between her comments and her termination, because of the very close temporal proximity between the two, particularly in light of evidence that Tramp did not follow the customary practices and procedures for terminating her, including prior written and oral warnings and the offer of an opportunity to resign.   She contends that the defendants cannot rely on Tramp's purported discovery of errors in the revised salary matrix as an intervening cause, because she was never informed that such errors were a reason for her termination and she believed that she had completed the salary matrix according to Tramp's instructions.   She also argues that the discharge may have been retaliatory, if it was motivated by her protected comments, even if there might have been other reasons.

In their Reply, the defendants reiterate that Truckenmiller's purportedly protected comments were not sufficiently clear and detailed or formal and serious to invoke the protection of the statute.   They also assert, for the first time, that intra-company complaints, made only to an employer, not to the government or appropriate agency, are not sufficient.   They also reiterate that timing alone is not enough to demonstrate a causal connection, and timing is Truckenmiller's only evidence.   They also argue that the record shows that Truckenmiller had plenty of warning that her poor performance was putting her job in jeopardy and that Tramp's discovery after Truckenmiller made her comments that she had failed to complete the salary matrix correctly is an intervening event breaking any causal connection.

### b.    Analysis

*i.    Sufficiency of the "complaint."*  As the parties acknowledge, on March 22, 2011, the Supreme Court decided the question of "whether the statutory term 'filed any complaint' [in § 215(a)(3)] includes oral as well as written complaints within its scope." *Kasten*, ___ U.S. at ___, 131 S. Ct. at 1329.  The Court held that it does.  *Id.*  Because that question is not in dispute here, it is unnecessary to summarize the Court's reasons for concluding that oral "complaints" are sufficient to invoke the protection of § 215(a)(3).[3]

What is squarely at issue here is whether Truckenmiller's "complaints" are otherwise sufficient *in form and content* under *Kasten*.  As the Court explained,

> We agree with Saint–Gobain that the statute requires fair notice.  Although the dictionary definitions, statutes, regulations, and judicial opinions we considered, *see supra*, at 4–7, do not distinguish between writings and oral statements, they do suggest that *a "filing" is a serious occasion, rather than a triviality.  As such, the phrase "filed any complaint" contemplates some degree of formality, certainly to the point where the recipient has been given fair notice that a grievance*

---

[3]Moreover, it is unnecessary for me to reach the question left open by the majority in *Kasten*, which is whether the FLSA's anti-retaliation provision "applies only to complaints filed with the Government."  *Kasten*, ___ U.S. at ___, 131 S. Ct. at 1336; *but see id.* at 1337-41 (Scalia, J., dissenting, joined by Thomas, J.) (stating that the dissenters would hold "that § 215(a)(3) does not cover complaints to the employer at all," and complaining that, while the majority passed on this question, their answer was implicit in their conclusion that informal oral complaints are sufficient).  The defendants here raised the question of whether or not Truckenmiller's intra-company complaints were sufficient only in their reply brief.  This court generally will not consider arguments made for the first time in a reply brief, and the defendants have no good cause for not raising the issue in their opening brief, when they cited *Kasten* for other purposes.  *See, e.g., Armstrong v. American Pallet Leasing, Inc.*, 678 F. Supp. 2d 827, 872 n.19 (N.D. Iowa 2009) (noting that inclusion of a new argument in a reply is contrary to N.D. IA. L.R. 7.1(g) and practice in this circuit, citing cases).

> *has been lodged and does, or should, reasonably understand the matter as part of its business concerns.*
>
> Moreover, the statute prohibits employers from discriminating against an employee " because such employee has filed any complaint." § 215(a)(3) (emphasis added).  And it is difficult to see how an employer who does not (or should not) know an employee has made a complaint could discriminate because of that complaint.  But we also believe that a fair notice requirement does not necessarily mean that notice must be in writing.
>
> At oral argument, the Government said that a complaint is "filed" when "a reasonable, objective person would have understood the employee" to have "put the employer on notice that [the] employee is asserting statutory rights under the [Act]." Tr. of Oral Arg. 23, 26.  We agree.  *To fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection.* This standard can be met, however, by oral complaints, as well as by written ones.

*Kasten*, ___ U.S. at ___, 131 S. Ct. at 1334-35 (emphasis added).

I believe that "'a reasonable jury could return a verdict for the nonmoving party' on the question" of whether or not Truckenmiller made a "complaint" satisfying these requirements.  *Woods*, 409 F.3d at 990 (defining a genuine issue of material fact precluding summary judgment (quoting *Anderson*, 477 U.S. at 248)).  Here, the circumstances may have been sufficiently "formal," in that the comments were made in a senior leadership meeting by a human resources director, even if the comments were not part of a discussion of a matter on the agenda, and even if they were made at the conclusion of the meeting as everyone was packing up to leave.  The context, the speaker, and the content do suggest that Truckenmiller was raising a serious, non-trivial issue that

she believed that Tramp and Burgess needed to consider, not least because it was the second time that she had raised the issue before the same leadership group. *Kasten*, ___ U.S. at ___, 131 S. Ct. at 1335 ("To fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection."). A reasonable jury could also find that the comments were sufficiently clear and detailed, as to both the differential in titles and pay rates, and the request that the matter be addressed further, to constitute fair notice to Tramp and Burgess of a complaint about violation of equal pay rights and a call for protection of those rights. *Id.* at 1334 ("'[F]iled any complaint' contemplates some degree of formality, certainly to the point where the recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand the matter as part of its business concerns.").

The defendants are not entitled to summary judgment on Truckenmiller's EPA retaliation claim on the ground that she did not make a qualifying "complaint."

*ii.* ***Causal connection***. As I recently noted, albeit in the context of a Title VII retaliation case, not an EPA retaliation case,

> The Eighth Circuit Court of Appeals has explained the requirements to prove the "causal connection" element, the third element of a *prima facie* case of retaliation, as follows:
>> "An inference of a causal connection between [protected conduct] and [an adverse employment action] can be drawn from the timing of the two events, but in general more than a temporal connection is required to present a genuine factual issue on retaliation." *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1119 (8th Cir. 2006) (citation omitted).
> *Thomas v. Corwin*, 483 F.3d 516, 531 (8th Cir. 2007); *see also Wells [v. SCI Mgmt., L.P.]*, 469 F.3d [697,] 702 [(8th Cir. 2006)] ("'A gap in time between the protected activity and

the adverse employment action weakens an inference of retaliatory motive'") (quoting *Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 633 (8th Cir. 2005)).  A lack of causal connection can also be "reinforced" by undisputed evidence of customer or co-worker complaints against the plaintiff.  *Wells*, 469 F.3d at 702.  Similarly, other intervening events between protected activity and adverse action may "erode" any causal connection suggested by temporal proximity between protected activity and adverse action.  *Cheshewalla [v. Rand & Son Constr. Co.]*, 415 F.3d [847,] 852 [(8th Cir. 2005)].

. . . .  Where the only connection between the protected activity and the adverse action is time, and that connection is only a weak one, that may not be enough to establish the third element of the plaintiff's prima facie case of retaliation.  *See Thompson v. Bi–State Development Agency*, 463 F.3d 821, 826 (8th Cir. 2006).  As the Eighth Circuit Court of Appeals has explained,

> Although we have opined that the "timing of [a] termination can be close enough to establish causation in a prima facie case," *Haas v. Kelly Servs., Inc.*, 409 F.3d 1030, 1037 (8th Cir. 2005), we have repeatedly stated that "[g]enerally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation," *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999); *see also Haas*, 409 F.3d at 1037.  Furthermore, "[o]ur recent cases have, in our view, made clear that a 'mere coincidence of timing' can rarely be sufficient to establish a submissible case of retaliatory discharge." *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002).

*Thompson*, 463 F.3d at 826; *accord Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 915 (8th Cir. 2006) (noting that Eighth Circuit cases "create a complicated picture" concerning the role of timing in retaliation claims).

*Strom v. Holiday Companies*, ___ F. Supp. 2d ___, 2011 WL 2200664, *24-*24 (N.D. Iowa June 6, 2011).

As in *Strom*, I believe that a reasonable jury could conclude that Truckenmiller has offered more than "temporal coincidence" to show the "causal connection" between her protected comments and her discharge, *cf. id.* at *24, or even that this is one of those rare instances in which the timing of the termination is close enough to the protected activity to establish causation in a *prima facie* case. *See Haas*, 409 F.3d at 1037. Truckenmiller was terminated the first day she was back in the office after making her purportedly protected comments in the May 24, 2010, meeting, and that meeting was the second time that she had raised the matter of the pay differential, indicating that she was likely to continue to pursue it. It would simply be bad policy to allow employers to escape liability for retaliatory actions if they act quickly enough to terminate an employee after the potentially protected conduct to allow the employer to argue that the termination was before the employee made more or more formal complaints either to the company or to an appropriate governmental agency or that there is no more than "temporal coincidence" between the comments and the firing. Furthermore, where there is evidence that Truckenmiller had not been advised prior to her termination that the salary matrix was still inaccurate, and there is at least a genuine issue of material fact as to whether Tramp stated at the time of the termination that further problems with the salary matrix were the basis for terminating Truckenmiller for "poor performance," there is a reasonable inference that Truckenmiller's potentially protected comments were a reason for her termination, which followed so closely on the heels of those comments. There is also evidence that Tramp did not follow the customary practices and procedures for terminating Truckenmiller, including prior written and oral warnings and the offer of an opportunity to resign, as evidenced, for example, by the defendants' efforts to show that these practices had been

*substantially* followed based on certain of Tramp's prior interactions with Truckenmiller. Also, for reasons explained below, a reasonable jury could find that the defendants' proffered "intervening cause" is actually a pretext for retaliation.    Finally, as Truckenmiller argues, "[w]here the immediate cause or motivating factor of a discharge is the employee's assertion of statutory rights, the discharge is discriminatory under § 215(a)(3) whether or not other grounds for discharge exist." *Brennan v. Maxey's Yamaha, Inc.*, 513 F.2d 179, 181 (8th Cir. 1975) (citing *Goldberg v. Bama Manufacturing Corp.*, 302 F.2d 152 (5th Cir. 1962), and *Mitchell v. Goodyear Tire & Rubber Co.*, 278 F.2d 562 (8th Cir. 1960)); *accord Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1394 (10th Cir. 1997) (quoting *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 387 (10th Cir. 1984), in turn quoting *Brennan*).

The defendants are not entitled to summary judgment on the lack of "causal connection" between Truckenmiller's purportedly protected comments and her termination.

### 3.    *The defendants' legitimate reason and pretext*

#### a.    *Arguments of the parties*

The defendants assert that they have proffered a legitimate, non-retaliatory reason for terminating Truckenmiller, what they characterize as her well-documented poor performance.  They argue that Truckenmiller cannot show that the proffered reason is a pretext for retaliation, because she has purportedly admitted that she has no facts, reasons, or documents to refute Tramp's reasons for terminating her other than the "projects" that she was working on themselves.  They dispute Truckenmiller's characterization of Butler's purported agreement that the Pathways to Excellence program was on schedule by May of 2010, because they assert that Butler told Truckenmiller that her timelines, objectives, and standards still were not met.  The defendants argue that Truckenmiller's complaints about pay differences do not insulate her from appropriate adverse actions for performance

failures, including the "final straw" of her submission of a salary matrix in May that was still inaccurate and without following Tramp's instructions to have her assistant double-check it.

Truckenmiller argues that the evidence shows that the positive aspects of her performance outweighed any deficiencies, so that there is no proper justification for her termination. She points to evidence that Tramp and other Burgess employees recognized the positive change in the "culture" at Burgess that she had helped produce. She also points out that Tramp never told her the purported specific reasons for her termination, failure to meet Pathways deadlines and failure to complete the 2010 salary matrix properly, upon which the defendants now rely. She points to evidence that Butler indicated that the Pathways project was on schedule and that she believed that she had, in fact, made the changes in the salary matrix that Tramp had requested. She also argues that the evidence that Tramp did not give her a final verbal or written warning or the opportunity to resign before terminating her suggests that the proffered reasons for her termination are pretextual. She contends that, at the very least, the evidence suggests that her protected comments about unequal pay were a motivating factor in her termination, even if other purported grounds existed.

In reply, the defendants argue that Tramp did specifically tell Truckenmiller that the reasons for her termination for poor performance included that the salary matrix that she had sent him was not accurate. They also argue that more specific explanations of Truckenmiller's "poor performance" are consistent with the reason stated at the time and, consequently, are not pretextual. They also argue that Truckenmiller's subjective belief that her performance had been good is largely irrelevant.

b.    *Analysis*

Truckenmiller does not dispute, nor could she, that "poor performance" is a legitimate reason for terminating an employee, and I find that the defendants have identified sufficient evidence of her poor performance to satisfy the burden of production to offer a legitimate, non-retaliatory reason for her discharge. *Cf., e.g., Hannoon v. Fawn Engineering Corp.*, 324 F.3d 1041, 1046 (8th Cir. 2003) (noting, in a Title VII case, that the employer's burden to offer a legitimate, non-discriminatory reason is merely one of production, and that this burden was met by a detailed documentary account of poor performance). Thus, the question is whether that proffered reason is a pretext and whether Truckenmiller can ultimately show that the defendants intentionally retaliated against her.

In a recent Title VII retaliation case, the Eighth Circuit Court of Appeals explained the methods of proving "pretext," as follows:

> "An employee can prove that [his] employer's articulated justification for an adverse employment action is pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Jones v. Nat'l Am. Univ.*, 608 F.3d 1039, 1046 (8th Cir. 2010) (quoting *Fitzgerald v. Action, Inc.*, 521 F.3d 867, 872 (8th Cir. 2008)). "Either route amounts to showing that a prohibited reason, rather than the employer's stated reason, actually motivated the employer's action." *Torgerson*, 643 F.3d at 1047.

*Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1021 (8th Cir. 2011). In the context of determining whether or not a discharge was retaliatory in violation of the FLSA, the Eighth Circuit Court of Appeals has observed, "The question is whether [the employer's] articulated reasons for discharge were a pretext for retaliation, not whether [the employee] actually did what he was accused of doing or whether discharge was warranted." *Grey*, 396 F.3d

at 1035; *accord Pye*, 641 F.3d at 1022 (explaining that "'[a] proffered legitimate, non-discriminatory reason for termination need not, in the end, be correct if the employer honestly believed the asserted grounds at the time of the termination.'" (quoting *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006)).   The court has suggested, however, that temporal proximity between the protected conduct and the discharge is also relevant to the question of whether the reasons given for the discharge are pretextual, *id.* (finding, in the context of an analysis of pretext, that the lack of temporal proximity weakened the inference of retaliation), although temporal proximity alone may not be enough to suggest pretext.   *See, e.g., Sprenger v. Federal Home Loan Bank of Des Moines*, 253 F.3d 1106, 1114 (8th Cir. 2001) ("[W]e have been hesitant to find pretext or discrimination on temporal proximity alone, and look for proximity in conjunction with other evidence.").   "Pretext may [also] be shown with evidence that the employer's reasons for the adverse action have changed substantially over time." *Loeb v. Best Buy Co.*, 537 F.3d 867, 873 (8th Cir. 2008).   It may also be shown by evidence that an employer did not follow its own policies and procedures in terminating the employee. *See Amini v. City of Minneapolis*, 643 F.3d 1068, 1076 (8th Cir. 2011); *Dixon v. Pulaski Cnty Spec. Sch. Dist.*, 578 F.3d 862, 871-72 (8th Cir. 2009).

Here, the question of "pretext," and, still further, the question of whether Truckenmiller was the victim of intentional retaliation, is a close one.   Nevertheless, I believe that "'a reasonable jury could return a verdict for the nonmoving party' on the question" of whether or not the defendants retaliated against Truckenmiller. *Woods*, 409 F.3d at 990 (defining a genuine issue of material fact precluding summary judgment (quoting *Anderson*, 477 U.S. at 248)).   I do not need to decide whether Truckenmiller's performance was actually good or bad to determine whether there are genuine issues of material fact on the issue of pretext, *see Grey*, 396 F.3d at 1035, I simply need to consider

31

whether Truckenmiller has generated genuine issues of material fact as to whether a retaliatory reason more likely motivated the defendants or as to whether the defendants' proffered explanation is unworthy of credence. *Pye*, 641 F.3d at 1021. I believe that she has generated genuine issues of material fact on both questions. Again, the temporal proximity between the potentially protected conduct and the discharge is so close here, particularly in the context of other evidence, as to suggest that Truckenmiller's potentially protected comments were the real reason for her discharge. *Cf. Grey*, 396 F.3d at 1035 (suggesting that temporal proximity is also relevant to pretext). Where there is also evidence that Truckenmiller had confirmed with Butler that the Pathways project was on schedule; that Truckenmiller believed that she had fixed the problems with the salary matrix according to Tramp's instructions and had not been told otherwise prior to her termination; that the usual customs and practices leading to her termination were not followed, and the defendants must attempt to find incidents that can substitute for following the ordinary procedures; and that the reasons given for Truckenmiller's discharge have evolved over time, *see Loeb*, 537 F.3d at 873, a reasonable jury could find that the proffered reasons either are not credible or that retaliation is more likely than not the real reason for Truckenmiller's discharge.

The defendants are not entitled to summary judgment on Truckenmiller's EPA retaliation claim on this ground, either.

### 4.   *Summary*

Although I might not so find on the present record, if I were the trier of fact, I conclude that a reasonable jury could find for Truckenmiller on her EPA retaliation claim. Somewhat more specifically, I find that there is sufficient evidence to generate genuine issues of material fact on whether or not Truckenmiller engaged in protected activity, whether that protected activity was causally connected to her discharge, and whether the

defendants' proffered reasons for her discharge are a pretext and that the real reason is intentional retaliation. Thus, the defendants are not entitled to summary judgment on Truckenmiller's EPA retaliation claim.

### C. The Wrongful Discharge Claim

The defendants have also moved for summary judgment on Truckenmiller's Second Cause Of Action, her claim of wrongful discharge in violation of the Iowa public policy against unequal pay on the basis of sex announced in IOWA CODE § 216.6. The parties now agree that this claim is preempted by IOWA CODE CH. 216. A common-law claim is preempted by the Iowa Civil Rights Act (ICRA), IOWA CODE CH. 216, unless the claim is separate and independent of an ICRA claim. *See, e.g., Richards v. Farner-Bocken Co.*, 145 F. Supp. 2d 978, 990-91 (N.D. Iowa 2001). Claims are not separate and independent when, under the facts of the case, success on the claim not brought under Chapter 216 requires proof of conduct prohibited by Chapter 216. *Id.* Here, where Truckenmiller alleges that the public policy at issue in her common-law wrongful discharge claim is the policy against unequal pay on the basis of sex articulated in IOWA CODE § 216.6, it is plain that the wrongful discharge claim depends upon, and is not separate and independent from, proof of conduct prohibited by Chapter 216, and the wrongful discharge claim is preempted.

The defendants are entitled to summary judgment on Truckenmiller's wrongful discharge claim. As this is the only claim against defendant Tramp, he is entitled to be dismissed from the action.

### *III.  CONCLUSION*

Upon the foregoing, the defendants' May 31, 2011, joint Motion For Summary Judgment (docket no. 13) is **granted in part** and **denied in part**, as follows:

1.      The part of the motion seeking summary judgment on Truckenmiller's EPA retaliation claim in her First Cause Of Action is **denied**; but

2.      The part of the motion seeking summary judgment on Truckenmiller's claim of wrongful discharge in violation of public policy in her Second Cause Of Action is **granted**.   Because this claim was the only one asserted against defendant Tramp, he is **dismissed** from this action.

**IT IS SO ORDERED.**

**DATED** this 30th day of September, 2011.

_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA